**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ryan Pate, | No. CV-25-03173-PHX-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| National Association of Intercollegiate Athletics, et al., | |
| Defendants. | |

Pending before the Court is Plaintiff Ryan Pate's second motion for a temporary restraining order ("TRO") and preliminary injunction, filed November 4, 2025, seeking to require Defendant, the National Association of Intercollegiate Athletics ("NAIA"), to allow him to play a final season of college basketball at Park University ("Park"). For the reasons explained below and on the record at the November 24, 2025 hearing on the motion, the motion is **denied**.

## I.    BACKGROUND

The parties are familiar with the facts underlying this dispute, as summarized in the Court's previous order. (*See* Doc. 17 at 1–5). Relevant to the motion now pending, Pate is a graduate college athlete attending Park's satellite campus in Gilbert, Arizona. (Doc. 18 ¶¶ 13, 15.) The NAIA is "an unincorporated private association that acts as a governing body of college sports" for "over 230 member colleges and universities," including Park. (*See id.* ¶¶ 4, 14.) "The NAIA and its members have adopted regulations governing all aspects of college sports," including rules that regulate players' eligibility. (*See id.* ¶ 14.)

Central to this dispute are two categories of NAIA eligibility regulations: the Term Limits, and a set of provisions Pate refers to as "the NAIA's Junior College ('JUCO') Eligibility Limitation Bylaws." (*Id.* ¶ 2.)

Under the NAIA's Term Limits, a student-athlete may participate in intercollegiate athletics only during a limited number of academic terms and a limited number of seasons of competition. (*Id.* ¶¶ 27–31.) The NAIA's "Terms of Attendance" limit the number of terms a student can be enrolled at an institution. (*See id.*) Article V, Section F, Item 1 of the NAIA's Bylaws (the "Bylaws") states, "[a] student terminates athletic eligibility at the end of a term upon completing [12] semesters."[1] (Doc. 37 at 17.) The Bylaws maintain "[a] term of attendance is any quarter, semester or trimester . . . in which the student becomes identified at a single institution." (*Id.*) The Bylaws allow a student to "play out a term if they have two-thirds of a term left." (*Id.*) This limit on Terms of Attendance operates independently of, but concurrently with, the NAIA's separate limit on the Seasons of Competition. (*See id.*) Article V, Section F, Item 3 of the Bylaws provides, "[n]o student shall be permitted to participate in intercollegiate athletics for more than four seasons in any sport." (*Id.*) Thus, to maintain eligibility, a student-athlete must have at least one unused Season of Competition and at least one remaining Term of Attendance; the exhaustion of either renders the athlete ineligible to compete. (*See id.*)

The NAIA also enforces what Pate refers to as the "JUCO Eligibility Limitation Bylaws," which govern the treatment of eligibility for student-athletes who previously attended junior colleges. (Doc. 18 ¶ 176.) The Bylaws count years spent at Junior Colleges ("JUCOs") "against the athlete's four seasons of allowed competition at an NAIA institution." (*Id.*)

Pate competed at multiple institutions between 2018 and 2024. (*Id.* at ¶¶ 16–21.) During that time, he accumulated three Seasons of Competition and 11.33 Terms of Attendance under the NAIA's eligibility framework. (*Id.* at ¶¶ 25, 42.) Then, in 2024, Pate

---

[1]    Typically, the Bylaws limit Terms of Attendance to 10 semesters, but Pate was granted two additional semesters due to COVID-related eligibility exceptions. (*See* Doc. 37 at 5, 49.)

verbally committed to play basketball for Park during the 2024–2025 academic year pending his NAIA eligibility determination. (*Id.* at ¶ 40.) In June 2024, the NAIA declared Pate eligible to play basketball for Park for the Fall 2024 term. (*Id.* at ¶¶ 41–42.) The NAIA eligibility portal showed Pate used 11.33 Terms of Attendance and three Seasons of Competition. (*Id.* at ¶ 42.) Although the portal showed Pate had 0.00 Terms of Attendance remaining, the parties do not dispute that 0.67 Terms of Attendance remained. (*Id.* at ¶¶ 42–43; Doc. 37 at 11.)

Pate participated in a limited number of games during the Fall 2024 semester because of an injury. (Doc. 18 ¶ 60.) Then, at the start of the Spring 2025 semester, Pate was informed he "only had one [semester] to play when he enrolled at Park for the Fall 2024 [semester] and his last [semester of eligibility] was exhausted following the conclusion of the Fall 2024" semester. (*Id.* ¶ 69.) Pate was not eligible to participate in the Spring 2025 portion of Park's basketball season. (*Id.* ¶¶ 67, 69.)

Park appealed the eligibility decision to, and requested an exemption from, the NAIA but was unsuccessful. (*Id.* ¶¶ 87, 90, 95, 98, 100, 109.) After he received a final decision from the NAIA, Pate retained counsel to obtain NAIA records and was told that the NAIA's decision was final as of February 2, 2025. (*Id.* ¶¶ 109, 125, 126.)

After unsuccessful negotiations with the NAIA, Pate initiated this litigation on August 29, 2025, when he filed his first motion for a temporary restraining order and preliminary injunction. (*See* Docs. 1, 3.) Pate's first TRO sought an order requiring the NAIA to declare him eligible to compete for an additional season of basketball at Park. (*See* Doc. 3 at 17.) Pate's first complaint asserted three claims, each of which he argued provided a basis for injunctive relief: (1) the NAIA's Attendance-Based Restrictions violate Section 1 of the Sherman Act; (2) the NAIA's application of those restrictions, as applied to Pate, violates Section 1 of the Sherman Act; and (3) the NAIA made negligent misrepresentations regarding his eligibility. (*Id.* at 7–13.) Pate did not challenge "a governing body's general ability to set limits on how long a college athlete may play college sports." (Doc. 12 at 1–2.)

At oral argument on September 12, 2025, Pate clarified that his challenge focused on the "season-splitting" dilemma created by the interaction of the NAIA's attendance-based rules with sports spanning both fall and spring semesters. Pate contended that the NAIA's Terms of Attendance Rule creates a "season-splitting dilemma," which affects student-athletes who have only one remaining term of attendance in sports that span both the fall and spring semesters. According to Pate, such athletes must choose between competing during the fall semester or saving their final term of attendance for the spring semester, effectively preventing them from participating in a full season.

On October 20, 2025, the Court denied Pate's motion for injunctive relief. (*See* Doc. 17.) The Court concluded that Pate lacked standing because the injury he identified, his inability to compete in the Spring 2025 semester due to the season-splitting dilemma, was a past harm that could not be remedied by prospective relief. (*Id.* at 7–10.) The Court noted that, although Pate retained a Season of Competition, he had exhausted his remaining Term of Attendance, and the NAIA could not apply the season-splitting rule to him in the future. (*Id.* at 9.) Because Pate could not demonstrate a real and immediate threat of future harm similar to that suffered in Spring 2025, he lacked standing to pursue a TRO or preliminary injunction. (*Id.*)

On November 4, 2025, Pate filed the present motion, along with an Amended Complaint adding Park as a defendant. (Doc. 18, 19.) Pate seeks an order compelling the NAIA to allow him to participate in the remainder of Park's 2025–2026 basketball season along with damages and a permanent injunction prohibiting the NAIA from "enforcing NAIA Bylaws" against him. (Doc. 18 at 86–87.)

Pate's Amended Complaint upon which the second motion for a TRO and preliminary injunction is based reasserts his Sherman Act challenges to the NAIA's season-splitting dilemma and his negligent-misrepresentation claim, and also asserts three new claims which, he argues, justify injunctive relief: (1) a Sherman Act challenge to the NAIA's Term Limit, alleging that the attendance-based eligibility rule as a whole constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act; (2) a

1   parallel Sherman Act challenge to the NAIA's JUCO Eligibility Limitation Bylaws; and

2   (3) a breach of contract claim against the NAIA, alleging that he is a third-party beneficiary

3   of a contract between Park and the NAIA.  (Doc. 19 at 6–13.)

4        Pate acknowledges that he has exhausted his permissible Terms of Attendance but

5   maintains that he still retains one Season of Competition under NAIA rules.  (*See id.* at 2.)

6   He asserts that the only barrier to his participation this year is the NAIA's attendance-based

7   eligibility limitation.  (*Id.*)  It is undisputed that he retains one Season of Competition

8   because he played a limited number of games during the 2024–2025 season due to injury.

9   (*Id.* at 2–3; *see* Doc. 32 at 3.)  Pate seeks injunctive relief permitting him to use that

10  remaining Season of Competition to participate in the 2025–2026 basketball season at Park.

11       The Court held a hearing on the preliminary injunction and temporary restraining

12  order on November 24, 2025, during which the parties presented oral argument, but did not

13  call any witnesses or provide additional evidentiary materials.  At the hearing, the Court

14  denied Pate's motion and stated that this order would follow.

15  **II.    LEGAL STANDARD**

16       Courts may issue a TRO or preliminary injunction while an action is pending.  *See*

17  Fed. R. Civ. P. 65.  To obtain either, a plaintiff must establish that he is (1) "likely to

18  succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary

19  relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in

20  the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[2]

21  However, "if a plaintiff can only show that there are serious questions going to the merits,"

22  rather than a likelihood of success, "a preliminary injunction may still issue if the balance

23  of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are

24  satisfied."  *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)

25  (quotation marks omitted).  This is because the "elements of the preliminary injunction test

26  must be balanced, so that a stronger showing of one element may offset a weaker showing

27

28  _____

[2]      The *Winter* factors apply to both motions for TROs and for preliminary injunctions.
*See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)
(stating that the "analysis is substantially identical for the injunction and the TRO").

of another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  A plaintiff must meet all four requirements—failure to satisfy his burden on even a single factor justifies denying relief.  *See DISH Network Corp. v. FCC*, 653 F.3d 771, 776–77 (9th Cir. 2011).

Ultimately, a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (citation modified).  Where, as here, the plaintiff seeks a "mandatory injunction"—an injunction that "orders a responsible party to take action"—relief must be denied "unless the facts and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (citations omitted).  Mandatory injunctions are "particularly disfavored" because they "go[] well beyond simply maintaining the status quo." *Id.* (citation omitted).

Before reaching the preliminary injunction factors, however, courts "must assure [themselves] that the constitutional standing requirements are satisfied." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).  "Standing must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties." *Id.*  The "burden of establishing Article III standing remains at all times with the party invoking federal jurisdiction." *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 655 (9th Cir. 2002).

### A. Article III Standing

Two theories asserted in the present TRO and preliminary injunction application mirror those advanced in Pate's August 2025 TRO and preliminary injunction application: (1) the Sherman Act challenge to the NAIA's season-splitting dilemma, and (2) the negligent-misrepresentation claim.  (*Compare* Doc. 3 at 7–12; *with* Doc. 19 at 6–8, 12–13.)  In its October 20, 2025 order, the Court denied injunctive relief on those theories after finding that Pate lacked standing. (Doc. 17 at 8–9.)  The Court found "Pate does not face any future harm that injunctive relief could prevent."  (*Id.* at 9.)  Pate's renewed motion presents those theories in materially identical form and identifies no intervening facts or legal developments undermining the prior analysis.  Accordingly, Pate lacks standing to

1   pursue injunctive relief on those claims for the reasons stated in the order at Doc. 17.  (*See*
2   Doc. 17 at 8-9.)

3       Pate's Amended Complaint and renewed TRO, however, assert new claims
4   challenging the NAIA's authority to restrict student-athlete eligibility.  Unlike the claims
5   addressed in the Court's October 20, 2025 order, these theories identify a concrete and
6   imminent injury: but for the NAIA's Term Limits and JUCO Eligibility Limitation Bylaws,
7   Pate would be eligible to compete for an additional season.  Because these restrictions
8   operate now to bar his participation, Pate has alleged an ongoing and particularized injury
9   that injunctive relief could remedy.  He therefore has standing to pursue these claims.

10      **B.  Likelihood of Success on the Merits**

11      The Court begins with the "most important" factor in the *Winter* analysis, Pate's
12  likelihood of success on the merits, and concludes that he has not carried his burden.  *See*
13  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  Because this
14  showing is a threshold requirement, the remaining *Winter* elements need not be addressed.
15  *Id.*  ("[i]f a movant fails to meet this threshold inquiry, the court need not consider the other
16  factors" (citation omitted)).

17      **1.  The Term Limit and JUCO Eligibility Limitation Bylaws Are Not
18      Subject to the Sherman Act**

19      Pate alleges that the NAIA Term Limits and JUCO Eligibility Limitation Bylaws
20  violate Section 1 of the Sherman Antitrust Act of 1890 ("the Sherman Act"), which
21  provides that "[e]very contract, combination in the form of trust or otherwise, or
22  conspiracy, in restraint of trade or commerce among the several States, or with foreign
23  nations, is declared to be illegal."  15 U.S.C. § 1.  For their part, Defendants contend that
24  under *O'Bannon v. NCAA*, 802 F.3d 1049, 1065 (9th Cir. 2015), the NAIA rules are not
25  subject to scrutiny under the Sherman Act because the rules are not commercial, but rather,
26  are "[t]rue eligibility rules."  (Doc. 37 at 9.)

27      The Supreme Court has long held that "restraint of trade" means "undue restraint."
28  *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021); *Nat'l Collegiate Athletic*

*Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984) ("[A]s we have repeatedly recognized, the Sherman Act was intended to prohibit only unreasonable restraints of trade.").  "By its plain language, this section applies . . . only if the rule is commercial in nature." *Worldwide Basketball and Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004); *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 668 (3d Cir. 1993) ("It is axiomatic that section one of the Sherman Act regulates only transactions that are commercial in nature.")  Thus, before courts can determine whether a restraint on trade is reasonable, they must first decide whether the challenged rule regulates a commercial activity—that is, an "activity from which the actor anticipates economic gain." *See O'Bannon*, 802 F.3d at 1065.

Whether athlete eligibility rules, like those Pate challenges, regulate "commercial activity" remains unsettled.  No binding precedent categorizes all college eligibility rules as commercial in nature.  In *Alston*, the Supreme Court upheld a permanent injunction of the NCAA's rules limiting education-related compensation under the Sherman Act.  594 U.S. at 80–84.  The district court found that the rules at issue were commercial in nature because they limited the size of the athletic scholarships that schools were permitted to offer in exchange for students' athletic services.  *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1063, 1066 (N.D. Cal. 2019), aff'd, *Alston*.  On appeal, the Supreme Court held that the NCAA was undoubtedly a commercial enterprise, *Alston*, 594 U.S. at 94–96, but its decision concerned "only a narrow subset of the NCAA's compensation rules" and future challenges to the NCAA rules would require a fact-specific assessment, *id.* at 108 (Kavanaugh, J., concurring).  The Court further directed that whether an antitrust violation exists necessarily depends on a careful analysis of the market realities.  *Id.* at 93.

Since *Alston*, neither the Supreme Court nor the Ninth Circuit Court of Appeals has addressed whether college sports bylaws—apart from those at issue in *Alston*—are subject to antitrust scrutiny.  In the wake of *Alston*, the NCAA shifted course and allowed student-athletes to earn compensation for their name, image, and likeness ("NIL").  *See, e.g.*,

*Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 759 (E.D. Tenn. 2024); *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 532 (M.D. Tenn. 2024). Courts have increasingly recognized that the economic realities of college athletics are rapidly evolving in the NIL era. *See*, *e.g.*, *Pavia*, 760 F. Supp. 3d at 536–37. Some courts have found NIL compensation has blurred the line between rules that are plainly commercial, and eligibility rules once viewed as purely non-commercial. *See id.; Hasz v. Nat'l Collegiate Athletic Ass'n,* 2025 WL 2083853, at *3 (D. Neb. 2025).

Numerous cases have challenged the NCAA's "five-year rule," which is akin to the NAIA's Term Limits, as well as the NCAA's JUCO Rule, which is akin to the NAIA's JUCO Eligibility Limitation Bylaws. The lower courts that have confronted the issue have reached differing conclusions about whether the comparable NCAA rules are subject to scrutiny under the Sherman Act. *Compare Johnson v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1790345, at *10 (D. Mont. 2025) (denying injunctive relief to preclude enforcement of the Five-Year Rule "[b]ecause the Challenged Rules are true eligibility rules, they are not commercial in nature and are not subject to antitrust scrutiny under the Sherman Act"); *and Hasz*, 2025 WL 2083853, at *4–5 (holding plaintiff failed to meet his burden to show the Five-Year Rule falls within the scope of the Sherman Act because there was no evidence in the "record demonstrating how the Five-Year Rule could be read as regulating compensation for student-athletes."); *with Elad v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 1202014, at *7 (D.N.J. 2025) (holding that the JUCO Rule is subject to the Sherman Act "because a NIL agreement is a commercial transaction and the JUCO Rule limits who is eligible to play and therefore to negotiate a NIL agreement."); *and Pavia*, 760 F. Supp. 3d at 537 (finding the NCAA's eligibility rules are subject to the Sherman Act because "it necessarily follows that restrictions on who is eligible to play and therefore to negotiate NIL agreements is also commercial in nature"). To date, this Court has not identified any decision addressing whether any NAIA rules are commercial or noncommercial, nor have the parties cited any.

Pate relies on *Elad* and *Pavia* to argue that the NAIA restrictions at issue are restrictions on competition opportunities and operate as commercial restraints. (Doc. 33 at 5.)  That reliance is misplaced.  *Elad* is distinguishable because it was decided on a significantly more developed factual record.  Elad was a collegiate football player who sought to enjoin the NCAA's enforcement of its Five-Year Rule as it applied to his JUCO time.  *Id.* at *1.  Elad supported his request for injunctive relief with testimony from multiple witnesses, including a Division I head football coach and an economics expert specializing in labor relations in sports.  *Id.* at *2.  The economics expert offered detailed market analysis addressing how the challenged rule suppressed competition for athlete services, depressed recruitment prices, and prematurely shortened athletes' careers.  *Id.* The court relied on the economic expert's testimony to conclude that "the JUCO Rule is commercial in nature because a NIL agreement is a commercial transaction and the JUCO Rule limits who is eligible to play and therefore to negotiate a NIL agreement."  *Id.* at *7. Notably, what was at stake in *Elad* was a NIL deal that entailed "$550,000 compensation with an additional $100,000 incentive bonus if [Elad was] named to the All-Big Ten First Team."  *Id.* at *6.  Similarly, in *Pavia*, the plaintiff challenged NCAA eligibility rules in the context of a well-established NIL marketplace.  *Pavia*, 765 F. Supp. 3d at 532.  There, the plaintiff estimated that he could earn over $1 million in NIL compensation in the 2025–26 season, and the court recognized that access to Division I competition directly determined his ability to participate in that market.  *Id.* at 534.

Neither *Elad*, nor *Pavia*, nor *Alston* compel the conclusion that the Sherman Act applies to the pertinent rules in this case.  On the record presented, Pate's Sherman Act theory fails at the threshold because he has not shown that the NAIA Term Limits or JUCO Eligibility Limitation Bylaws "regulate or restrain trade" in any commercial market covered by the Act.  Although Pate relies heavily on cases addressing NCAA regulations, those cases involved circumstances in which the NCAA rules at issue restricted access to a well-developed NIL marketplace.  *See Elad*, 2025 WL 2025 WL 1202014 at *6; *Pavia*, 765 F. Supp. 3d at 532.

Here, Pate has failed to show that the NAIA's Bylaws limit his access to any commercial marketplace. Pate first asserts that the NAIA Bylaws may diminish his professional scouting exposure or impede his long-term athletic trajectory. (Doc. 33 at 9.) While the Court does not discount the significance of these concerns to Pate personally, such harms do not transform what courts have recognized as "true eligibility rules" into regulations of a commercial nature subject to antitrust scrutiny. All eligibility rules, by their nature, impact an athlete's competitive opportunities and professional exposure because they limit when and how many seasons a student-athlete may compete. Yet no court has held that such effects convert a traditional eligibility rule into a rule subject to the Sherman Act. *See O'Bannon*, 802 F.3d at 1066 (reasoning that true eligibility are not related to the NCAA's commercial or business activities); *see also Smith v. NCAA*, 139 F.3d 180, 185–86 (3d Cir. 1998) (holding that the Sherman Act did not apply to an eligibility rule governing the number of years student-athletes may compete), vacated on other grounds by *NCAA v. Smith*, 525 U.S. 459 (1999). Furthermore, Pate cites to no authority suggesting that these consequences alter the noncommercial nature of eligibility rules.

Pate also argues generally that "the NAIA allows athletes to enter into contractual agreements for their [NIL]." (*Id.* at 7.) At oral argument, he further suggested that he may be missing out on potential NIL opportunities. Yet Pate acknowledged that he did not engage in any NIL activity during his previous basketball season and identified no specific NIL offers, inquiries, or negotiations that he has lost or foregone because of the NAIA's eligibility rules. He provided no examples of NAIA athletes who have secured NIL agreements. And he did not submit information regarding the scope, frequency, or economic value of NIL opportunities within the NAIA more broadly. The absence of an economic expert or other competent evidence further underscores this deficiency. Defendants also represented that they were not aware of any NAIA athlete who has entered into an NIL agreement.

Pate has not established a likelihood that he can successfully prove that the NAIA's

Term Limit or JUCO Eligibility Limitation Bylaws operate as commercial restraints because Pate has not provided evidence linking these rules to any cognizable commercial market or that they have reduced NIL opportunities for Pate or NAIA athletes generally. The speculative and hypothetical harms alleged do not satisfy Pate's burden to show that the rules likely meaningfully restrain trade in a commercial market.  Accordingly, the Court cannot find that the challenged rules implicate commercial activity subject to the Sherman Act at this stage of the case.  This is not to say that Pate will be unable to produce such evidence at a later stage, but at the present time, the Court cannot say he has met his burden to show the Term Limits and JUCO Eligibility Limitation Bylaws falls within the scope of the Sherman Act.  Pate has therefore failed to demonstrate a likelihood of success on the merits of his Sherman Act claim.

### 2. Pate Has Also Failed to Demonstrate a Likelihood of Success Under His Breach of Contract Claim

Pate also asserts a breach-of-contract claim, alleging that as a college athlete and intended third-party beneficiary of a contract between Park and the NAIA, he is entitled to fair and reasonable enforcement of the NAIA's rules, and the NAIA breached this obligation by denying him eligibility for the 2025–26 men's basketball season.

Pate's breach of contract claim is governed by Arizona law.  *See Smith v. Central Ariz. Water Conservation District*, 418 F.3d 1028, 1034 (9th Cir. 2005).  Under Arizona law, a party outside of a contract may recover as a third-party beneficiary only if (1) an intention to benefit the claimant is indicated in the contract; (2) the contemplated benefit is both intentional and direct; and (3) it definitely appears the parties intended to recognize the third party as the primary party in interest.  *Brock Fam. P'ship, LLP v. Tellurian Dev. Co.*, 2022 WL 678040, at *3 (Ariz. Ct. App. 2022) (citing *Nahom v. Blue Cross & Blue Shield of Ariz., Inc.*, 180 Ariz. 548, 552 (App. 1994) (internal quotation omitted)).

Here, Pate has failed to meet these requirements.  Pate has not identified or submitted evidence of any specific contract between the NAIA and Park, has not cited contractual language indicating that the parties intended to confer a direct and intentional

benefit on him, and has not shown that he is the primary party in interest under the contract. Without such evidence, Pate cannot establish the threshold element necessary to succeed as a third-party beneficiary.    Accordingly, Pate cannot show a likelihood of success on the merits of his breach of contract claim.

Accordingly,

**IT IS ORDERED** that Pate's motion for a TRO and preliminary injunction (Doc. 19) is denied.

Dated this 9th day of December, 2025.

Honorable Sharad H. Desai
United States District Judge